IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SIDDEEQ BASIL HENRY : 
 : CIVIL ACTION
v. : NO. 14–1152
 :
JOHN THOMAS, et al. :

O'NEILL, J.                                                                                                          May 9, 2017

# MEMORANDUM

Pro se prisoner plaintiff Siddeeq Basil Henry brings § 1983 claims against defendant prison officials Arthur Johnson and L. Williams. Am. Compl., Dkt. No. 34.[1] He claims their actions violated his Eighth Amendment right to be free from cruel and unusual punishment and First Amendment right to free speech.[2] Defendants filed a motion for summary judgment, Dkt. No. 52, to which plaintiff responded, Dkt. No. 58. For the following reasons, I will grant defendants' motion.

---

[1] Plaintiff also brought claims against prison officials John Thomas and William Fowler. He alleged Thomas, the warden at SCI Chester, refused to prevent defendant Williams from harassing him and approved plaintiff's move to the infirmary. Am. Compl. ¶ 11. He alleged Fowler was responsible for his confinement in a psychiatric observation cell for sixteen days in violation of prison policy. Am. Compl. ¶ 10.
  Thomas is no longer a defendant in this action because, on February 25, 2016, I dismissed plaintiff's claims against him with leave to amend, Dkt. No. 43, and plaintiff did not file a second amended complaint.
  I will dismiss plaintiff's claims against Fowler without prejudice because plaintiff did not serve him, nor did Fowler waive service. Fed. R. Civ. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time."); Dkt. No. 1 (Complaint filed Feb. 25, 2014); Dkt. No. 34 (Amended Complaint filed July 13, 2015); Dkt. No. 40 (summons returned unexecuted).
[2] Plaintiff also claims his Fourteenth Amendment right to due process was violated, but because he has not stated a claim under that Amendment against either remaining defendant, I will dismiss it.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322–23. If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it might affect the outcome of the case under governing law. Id.

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007), quoting Fed. R. Civ. P. 56(c). "Where

the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id., quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

I. **Excessive Force Claim Against Johnson**

Plaintiff claims Corrections Officer Johnson used excessive force against him when he choked, elbowed and tightly handcuffed plaintiff. However, because Johnson's actions followed plaintiff's aggressive assault of Johnson in a prison hallway—punching him in the head four times—and because plaintiff did not suffer serious injuries, no reasonable jury could conclude, on the evidence before me, that officer Johnson acted "maliciously and sadistically to cause harm" rather than "in a good-faith effort to maintain or restore discipline," as required to establish an Eighth Amendment claim for excessive force. Hudson v. McMillian, 503 U.S. 1, 7 (1992). I will therefore grant defendants' motion for summary judgment with respect to plaintiff's claim against Johnson.

A. **Background**

Plaintiff was heading toward the prison yard when Johnson confronted him and asked where he was going. Henry Dep. at 9:19–24. They began to argue, and Johnson told plaintiff "they didn't call the F-ing yard yet, go back to [your] housing unit." Id. at 10:4–7. Plaintiff then assaulted Johnson, punching him in the head at least four times. Id. at 10:8–10; Dkt. No. 52, Ex. 2 (Video, 9 Corridor A, July 24, 2013) at 00:19–24. Immediately, Johnson and a guard standing with him began to struggle to restrain plaintiff and pin him against the wall. Id. at 00:22–28. Multiple guards emerged and attempted to restrain plaintiff, who struggled with them. Id. at 00:25–54; Henry Dep. at 10:10–14. Portions of the video are dark and plaintiff's body is out of view behind the swarm of officers around him. Plaintiff appears to be resisting the officers for at

3

least twenty seconds. Video at 00:25–45. It is not clear from the video when plaintiff ceases to struggle against the officers. Id. at 00:48–1:57. It is also not clear from the video at what point plaintiff was securely handcuffed. Id. at 00:29–1:05. Plaintiff was on the ground for about a minute and half. Id. 00:31–1:57; Henry Dep. at 27:20–22.

Plaintiff testified that Johnson put him in tight handcuffs that cut his wrists, only taking them off twenty minutes later. Id. at 11:23–12:3. He also testified that, during the take-down but after he was handcuffed, on the ground and subdued, Johnson choked him for approximately five seconds and elbowed him twice in the nose. Id. at 11:1–20. The video shows that while plaintiff is on the floor, Johnson, who unlike the other officers in the area is wearing a white shirt, placed his hands beside or around plaintiff's neck and kept them there for approximately ten seconds. Video at 1:36–1:46. Shortly after he removed them, the officers lifted plaintiff into a standing position and moved him to a standing position against the wall. Id. at 1:46–2:11. They then escorted him through a door and out of the hallway. Id. at 2:14–19. Plaintiff was taken to the prison's medical facility, where pictures were taken of his injuries and blood was cleaned from his face. Henry Dep. at 13:16–22.

**B.    Discussion**

In order to establish an Eighth Amendment claim for excessive or unjustified force, a plaintiff must show that the force was not "applied in a good-faith effort to maintain or restore discipline" but rather was used "maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7. "[C]orrections officers must balance the need to maintain or restore discipline through force against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that 'prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and

practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" Id. at 6, quoting Whitley v. Albers, 475 U.S. 312, 321–22 (1986). In determining whether force is excessive in violation of the Eighth Amendment, a court must consider the following factors:

> (1) the need for the application of the force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000), quoting Whitley, 475 U.S. at 321.

I view the evidence in the light most favorable to plaintiff and take as true that plaintiff was choked, elbowed in the face, and cut by the handcuffs. See McDowell v. Sheerer, 374 F. App'x 288, 292–93 (3d Cir. 2010) (taking plaintiff's testimony as true where the court was "unable to determine from the videos whether [the plaintiff] is resisting the officers or to determine the amount of force used on him. We cannot make this determination because [the plaintiff] is forced to the ground early in the confrontation, and the view of his body is completely obstructed by the bodies of at least five officers while they handcuff and shackle him"). The video does not contradict plaintiff's testimony, as plaintiff is largely obscured during parts of the incident. I therefore take plaintiff's testimony as true for the purposes of defendants' motion.

Nonetheless, I conclude that no reasonable jury could find that Johnson's conduct was sadistic and malicious rather than taken in a good-faith effort to restore discipline. Each of the foregoing factors weighs in favor of granting summary judgment.

### 1.     Proportionality of Johnson's Response

Under the first and second factors, "(1) the need for the application of the force; [and] (2) the relationship between the need and the amount of force that was used," the force Johnson used was not disproportionate to what was necessary. Brooks, 204 F.3d at 106. "The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Whitley, 475 U.S. at 319. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id.

If an officer's use of force immediately follows a prisoner's violent action, it is more likely to be proportionate to a need for the application of force. Camp v. Brennan, 54 F. App'x 78, 79–80 (3d Cir. 2002). In Camp v. Brennan, the Third Circuit held that the plaintiff had not presented a cognizable Eighth Amendment claim. Id. In that case, a video tape showed an officer applying a stun gun to the handcuffed plaintiff, who had fallen after he refused to walk through a doorway, then pushed off the doorway with his foot, causing the group he was with to stumble. Id. The court noted that the whole event lasted twenty seconds, "a reasonably short period necessary to subdue a struggling prisoner." Id.

In this case, nterpreting both the video and plaintiff's testimony in the light most favorable to plaintiff, it is clear that there was, at least initially, a serious need for Johnson's application of force after plaintiff violently attacked him. Although plaintiff challenges the need for force after he had been handcuffed and was lying on the ground, this argument improperly

disassociates the events, all of which occurred within two minutes. Indeed, interpreting the video in the light most favorable to plaintiff, Johnson choked him within at most a minute of his last acts of resistance. See Video at 00:45–1:37. No reasonable jury could conclude that the tightness of the handcuffs and Johnson's elbowing plaintiff in the nose were disproportionate to the need to restrain plaintiff after his aggressive attack on Johnson. Given that Johnson's conduct immediately followed the incident in which plaintiff punched him in the head four times, the first and second factors weigh against finding that Jonson's use of force was sadistic or malicious.

### 2. Lack of Serious Injury

Under the third factor, the lack of serious injury also weighs against a finding that the use of force was sadistic or malicious. As set forth by the Supreme Court,

> the extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.

Hudson, 503 U.S. at 7 (internal quotation marks and citations omitted), quoting Whitley, 475 U.S. at 321; see also Camp, 54 F. App'x at 80 (noting that the plaintiff's injuries "involved four dime-sized burns" which "does not prove that the amount of force was excessive"). However, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . . This is true whether or not significant injury is evident." Hudson, 503 U.S. at 9.

Plaintiff did not testify that he suffered serious injury as a result of Johnson's actions. He describes cuts on his wrists from the handcuffs and some blood on his face, but does not describe bruises or other injury from the choking. Furthermore, he does not testify that his injuries

7

required any medical care. The lack of serious injuries, while not dispositive, suggests that Johnson's restraint of plaintiff after plaintiff's violent outburst was not sadistic or malicious.

### 3. The Extent of the Threat to Safety

Under the fourth factor, a responsible official in Johnson's situation could have "reasonably perceived" a "threat to the safety of staff and inmates" based on plaintiff's immediately preceding violent behavior. Brooks, 204 F.3d at 106. Where a prisoner is behaving violently in a public place, an officer has more leeway in using force to restrain him. See Wesley v. Dombrowski, No. 03-4137, 2007 U.S. Dist. LEXIS 64601, at *45 (E.D. Pa. Aug. 31, 2007) ("[A]lthough [the plaintiff, who was handcuffed and physically weak] personally may not have posed a physical threat to the corrections officers, his admittedly animated conduct and apparently outward defiance of [the defendant officer's] orders could have incited nearby inmates to initiate a disruption."); Cf. Everett v. Nort 547 F. App'x 117, 119, 121–122 (3d Cir. 2013) (reversing a district court's grant of summary judgment for defendant officers where there was "no evidence that [the prisoner/plaintiff] was acting violently at the time he was in the restraint chair; he simply refused to open his fist," but officers nonetheless used a taser three times and threatened to break the plaintiff's fingers in order to get him to give his fingerprints); Diaz v. Aberts, No. 10-5939, 2013 U.S. Dist. LEXIS 14334 at *14–25 (E.D. Pa. Feb. 4, 2013) (noting that plaintiff did not pose a considerable risk to other staff or inmates when he was in his cell by himself when he was resisting); Davis v. Berks Cnty., No. 04-01795, 2007 U.S. Dist. LEXIS 9892 at *5 (E.D. Pa. Feb. 8, 2007) ("Even though [the plaintiff] bit [the defendant correction officer], [the plaintiff] was handcuffed throughout the incident, successfully placed back in his cell where he could have been locked down, and under the control of multiple guards. Therefore, the extent of the threat to the staff and other inmates could not have been high.").

8

Here, plaintiff was in a public hallway throughout the incident. Although it does not appear that other inmates were in the immediate vicinity, Johnson may have reasonably perceived a possibility that others would be threatened by plaintiff's actions. At least initially, plaintiff posed an obvious threat to the guards' safety, demonstrated by his assault on Johnson. Although this threat appears to have abated shortly after the assault, mitigating the weight of this factor, plaintiff's recent conduct and his location in the public hallway meant Johnson had more leeway in using force to restrain him.

### 4. Johnson's Efforts to Temper His Response

Under the fifth factor, viewing the evidence in the light most favorable to plaintiff, it appears Johnson made "efforts to temper the severity of a forceful response" to plaintiff's violent outbreak. Brooks, 204 F.3d at 106. It is evident from the video that the officers did not use aggressive force against plaintiff during the struggle nor did they prolong the period during which he was on the ground. Rather, after plaintiff struck him in the head, Johnson, with the help of another officer, seized plaintiff's arms and pressed plaintiff against a wall before bringing him to the floor. Video at 00:24–00:34. Neither Johnson nor his coworker struck or kicked plaintiff and plaintiff did not testify that either officer used excessive force in restraining him. The evidence shows that, at least initially, Johnson made an effort to temper his response.

Balancing these factors, I conclude that the evidence does not support a finding that the force Johnson applied was so excessive as to present a cognizable Eighth Amendment claim against him. Therefore, I will grant defendants' motion for summary judgment with respect to this claim.

## II. Retaliation Claim Against Williams

Plaintiff also brings a claim of First Amendment retaliation against Lieutenant Williams, arguing that she moved him from a cell in the Restricted Housing Unit to a cell in the infirmary in retaliation for his filing a grievance against her. Plaintiff presents insufficient evidence that Williams made the decision to take the adverse action of transferring him to the infirmary, rather than merely executed that decision, and therefore does not establish a retaliation claim against her predicated on the First Amendment. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). I will therefore grant defendants' motion for summary judgment with respect to this claim.

### A. Background

On December 16, 2013, plaintiff filed a grievance against Williams for mistreating another prisoner. Am. Compl. Ex. N, Dkt. No. 34-1 at p. 15. Plaintiff testified that, when a grievance is filed, it "goes on file" and the person against whom it was filed is notified. Henry Dep. at 29:19–22. Plaintiff had no "information that [Williams] was personally aware" that he filed the grievance, but testified that "it's a very strong possibility she could have been aware of it" because of the prison's grievance handling procedures. Id. at 31:7–12. Plaintiff's grievance was rejected because, he was told, a prisoner cannot file a grievance on account of harm to another prisoner. Id. at 28:25–29:4.

Plaintiff alleged that, around this time, Williams "always made sexual comments" to him.[3] Am. Compl. ¶ 11. He testified that, shortly after he had filed the grievance, Williams

---

[3] In his grievance against Williams, which he attaches to his Amended Complaint, he says that she "has made several sexual comments to me saying what you wanna fuck me I like bitches (females) not niggas (males)." Dkt. No. 34-1 at p. 13 (Official Inmate Grievance, Dec. 16, 2013). He did not testify to this particular comment in his deposition.

asked him if "want[ed] to stay in jail because [he's] a homosexual, [does he] want to stay around all these dicks." Henry Dep. at 33:2–4.

On December 21, 2013, Williams transferred plaintiff from his cell in the Restricted Housing Unit to a cell in the infirmary. Id. at 38:13–16. When he asked for an explanation, she told him she was "tired of hearing [his] mouth." Id. at 38:13–16; 22:25–23:6 (stating that the only explanation he was given for his move to the infirmary is that "[s]he's tired of hearing my mouth"); see also Am. Compl. at p. 18 (Official Inmate Grievance, Dec. 21, 2013) (explaining that "today I was moved from the RHU [Restricted Housing Unit] by Lt. L. Williams and placed in the infirmary and Lt. L. Williams told me it was because she got tired of hearing my mouth"). Williams told him that this move was approved by the superintendent. Henry Dep. at 30:1–3, 12–14. Plaintiff filed a grievance against Williams for this transfer and received a denial that stated, "RHU offenders are housed in the RHU and in some cases the infirmary, the housing unit change was approved by the facility manager." Am. Compl., Ex. H (Initial Review Response, SCI Chester, Grievance # 490828, Dec. 31, 2013).

Plaintiff testified that the infirmary is for "mentally impaired people." Henry Dep. at 32:6–7. Plaintiff had a history of mental illness: he attempted suicide in September 2013 by placing a sheet around his neck, id. at 15:1–22; 36:14–37:12, and again that November by attempting to cut himself with a light fixture, id. at 15:23–16:25. He was then transferred to the Mental Health Unit at Graterford for a psychiatric evaluation. Id. at 19:21–25. He was later moved to Coal Township and put initially in the Restricted Housing Unit before Williams moved him to the infirmary. Id. at 20:1–25. After being housed in the infirmary for about a month, plaintiff destroyed his cell, breaking the windows and the bed. Id. at 22:7–9, 39:1–12, 43:24–

11

44:1. He believes he acted this way during a psychotic episode triggered by his housing conditions in the infirmary. Id. at 44:18–21.

While in the infirmary, he did not have access to the law library. Id. at 46:15–16. He had a bed and was fed, given showers, allowed to exercise in his cell and occasionally given outdoor exercise time. Id. at 21:3–19. However, he was "isolated" because he was an "RHU inmate." Id. at 30:17–23. He testified he was "locked behind a cage." Id. at 30:21–23.

**B. Discussion**

Viewing the evidence in the light most favorable to plaintiff, I find it insufficient to establish that Williams made the decision to transfer plaintiff to the infirmary, which is an essential component of a retaliation claim. Although defendants bear the burden on a motion to dismiss of showing that there is no dispute of any material fact and that they are entitled to judgment as a matter of law, plaintiff must present "more than a mere scintilla of evidence in [his] favor" in order to overcome their motion. Williams, 891 F.2d at 460. Plaintiff's allegation that Williams brought him to the infirmary and her comment to him in the process is not a sufficient basis for a jury to conclude that she made the decision to move him.

"[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), quoting Allah v. Seiverling, 229 F.3d 220, 224–25 (3d Cir. 2000).

> A prisoner alleging retaliation must show (1) constitutionally protected conduct, (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him.

Id. (internal quotation marks and alterations omitted), quoting Rauser, 241 F.3d at 333.

Defendants concede, for the purposes of this motion, that the first and second elements are satisfied. Dkt. No. 52 at 11. The parties focus their briefs on the third element, which requires a showing of a "causual link" between plaintiff's filing of the grievance and Williams' moving him to the infirmary. To show causation, a plaintiff must present sufficient evidence that the defendant both made the decision to take the adverse action and knew about the constitutionally protected conduct. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

Plaintiff has not presented sufficient evidence to support a finding that Williams, rather than some other prison official, made the decision to transfer plaintiff from his cell in the Restricted Housing Unit to the infirmary. To the contrary, the surrounding circumstances of his transfer do not suggest that Williams made that decision. First, plaintiff testified that the move to the infirmary was approved by the prison superintendent. This fact undermines plaintiff's argument that Williams decided to move him to a different cell as a form of retaliation. Second, the circumstances of plaintiff's confinement suggest that this move was part of a broader process of moving plaintiff to different locations in order to maintain the health and safety of all involved. Indeed, he had been frequently moved between different units in the last several months. Williams's statement that she was "tired of hearing your mouth" is too ambiguous to support a jury finding that Williams herself made the decision to move plaintiff. Although a factfinder may be able to infer that Williams knew about plaintiff's grievance,[4] it would be mere

---

[4] Defendants argue that plaintiff presents no evidence showing that Williams knew a grievance had been filed against her, and therefore cannot support his claim for retaliation. But plaintiff testified that the grievance procedure in the prison was to notify the person against whom it was filed. Henry Dep. at 29:19–22. Therefore, although plaintiff's evidence regarding

13

conjecture to conclude that she decided to transfer him. Therefore, plaintiff has not presented sufficient evidence for a jury to find in his favor on his retaliation claim against Williams.

Plaintiff focuses his causation argument on other evidence, including temporal proximity between his grievance and his transfer and a pattern of antagonistic behavior from Williams. While such evidence can support an inference of causation, see Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007), a plaintiff must first present sufficient evidence on the defendant's decisionmaking and knowledge. As I explained, he must show that Williams both made the decision to take the adverse action and knew that plaintiff had participated in constitutionally protected conduct. Because he has not presented evidence that she made the decision, I will grant defendants' motion for summary judgment on this claim.

An appropriate Order follows.

---

Williams's knowledge of his grievance is thin, I do not believe this lack of evidence is the main problem with his claim.